**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**TIMOTHY G. MORRIS,**

      **Plaintiff,**

**vs.**                           **Case No. 4:09cv442-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded for reconsideration.

**Procedural status of the case**

Plaintiff, Timothy G. Morris, applied for disability insurance benefits and supplemental security income (SSI) benefits. His last date of insured status for disability benefits was September 30, 2007. Plaintiff alleges disability due to severe pain associated with herniated cervical discs and degenerative disc disease of his neck

and lower back, right shoulder pain from a labrum tear, anxiety, depression, and intermittent explosive personality disorder, with onset on June 1, 2004. Plaintiff was 41 years old at the time of the administrative hearing (on October 29, 2008), has a 9th grade education, and has past relevant work as a truck driver.

The Administrative Law Judge found that Plaintiff has the residual functional capacity to do a limited range of light work.[1] R. 18. In particular, he found that Plaintiff must avoid crawling or climbing ropes or scaffolds when doing light work. *Id.* For sedentary occupations only, the ALJ found that Plaintiff must be provided a sit or stand option. *Id.* That is, if performing a sedentary job, Plaintiff must be allowed to take no more than five steps from work, stretch, and return to work within one minute, and to do this no more than five times each hour. *Id.* The ALJ also said that for a sedentary job only, Plaintiff must avoid interaction with the public, and must be limited to occasional communication about the job with supervisors and coworkers. *Id.*

The ALJ determined that Plaintiff can still do his past relevant work as a truck driver since a number of such jobs now require only an ability to do light work. R. 23.

---

[1] The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

Thus, he concluded that Plaintiff is not disabled.  R. 23.  The ALJ did not explain how Plaintiff could drive a truck for several hours in a seated position and perform his sit or stand option five times an hour.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner. Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[2]

On July 15, 2004, Plaintiff sought mental health treatment from Mental Health

Care, Inc., for depression, anger, irritability, and low energy. R. 150, 159. He said he

had trouble getting to sleep and wanted to hurt others who made him angry. R. 151.

He said he gets along with "everybody," and got along with his family except when he

argued with family members. R. 155, 153. He reported that he had been "homeless"

for several years, but not at that moment. R. 153. He said he had worked for labor

pools and drove a truck. R. 154. He was making about $600 a month doing odd jobs.

Id. His physical appearance was casual and his hygiene was good. R. 157. He was

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm. Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

cooperative during the interview, and his speech was normal and coherent. *Id.* His

mood was depressed. *Id.* He said that he had a learning disability. R. 158. He was

found to be attentive, with intact recent, short-term, and remote memory. *Id.* His insight

and judgment were thought only to be fair. *Id.* The diagnosis was major depressive

disorder, recurrent, and a GAF[3] score of 55[4] was assigned. R. 159. It was determined

that Plaintiff needed medication and counseling. *Id.*

On August 24, 2004, Plaintiff had a psychiatric evaluation by Barbara E. Stoll,

M.D. R. 161-165. Plaintiff reported that he was "tired and miserable all the time," was

easily angered, and had gotten into fights. R. 161. Plaintiff said he had been short-

tempered since he was a teenager and his symptoms had become "very bad in the past

five or six years." *Id.* Plaintiff said he kept on losing jobs because of his temper, and he

said he had difficulty getting along with people. *Id.* Plaintiff said he was not currently

under any medical treatment, and he was in no acute physical distress. R. 162. He

thought he might have a learning disability. *Id.* He said that he was able to attend to all

of his own activities of daily living and care for himself. *Id.* Dr. Stoll found Plaintiff to be

cooperative throughout the interview, with good eye contact. R. 164. His mood

appeared to be "quite irritable." *Id.* His attention during the interview was good, and

Plaintiff's memory appeared to be grossly intact, though he reported significant short-

---

[3] Global Assessment of Functioning. Axis V of the DSM-IV Multiaxial System and
the meaning of the GAF scores is explained at:
http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[4] A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and
circumstantial speech, occasional panic attacks ) OR moderate difficulty in social,
occupational, or school functioning ( e.g., few friends, conflicts with peers or co-
workers). *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

term memory problems. *Id.* Dr. Stoll's diagnosis was major depression, single episode, no psychosis, rule out antisocial traits, and back pain. *Id.* She assigned a GAF score of 48.[5] *Id.* Plaintiff was to begin taking Wellbutrin.[6] *Id.*

On November 16, 2004, Plaintiff was seen again for mental health treatment. R. 160. He felt "pretty good." *Id.* His temper was less agitated and irritable, but he still isolated himself. *Id.* He felt his temper was better. *Id.* He was to continue taking Sinequan.[7] *Id.*

On December 22, 2004, Plaintiff was examined by Deborah F. Shultz, M.D., on referral by the Florida Office of Disability Determinations. R. 166. Dr. Shultz understood Plaintiff to be claiming disability due to back pain, neck pain, and depression. *Id.* Plaintiff said he had been depressed all of his life, but said that he had only recently been so diagnosed by Dr. Stoll. *Id.* Plaintiff said that he did not want to be around people, becomes very angry with people, and cannot control his temper. *Id.* Plaintiff said that he had a motor vehicle accident in 1982, and began having neck and back pain after the accident, which has steadily grown worse. *Id.* He said that the pain bothers him with any sort of physical activity. *Id.* He said he had shooting pain into his right arm, and he cannot lift over 20 pounds. *Id.* Dr. Shultz found on examination that Plaintiff had normal sensory and motor responses in his upper and lower extremities.

---

[5] A GAF score of 41-50 indicates: "Severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational or school functioning ( e,g., no friends, unable to keep a job )." *See Ibid.*

[6] Wellbutrin is indicated for treatment of depression. PHYSICIANS' DESK REFERENCE (2005).

[7] Sinequan is used to treat depression and anxiety. PHYSICIANS' DESK REFERENCE (2004), p. 2636.

R. 168. Dr. Shultz said that while there was tenderness to palpation in the right arm, "but once again there was normal sensory and motor response." *Id.* Dr. Shultz noted a "somewhat somber mood" and that Plaintiff "seemed agitate at times." *Id.* She found Plaintiff's speech and intellectual functions to be normal. *Id.* Plaintiff's grip strength and fine manipulation were also normal. *Id.* Plaintiff had normal range of motion of all major joints, but had tenderness over the right arm and in his cervical and lumbar spine. *Id.* There was no muscle spasm or atrophy. *Id.* Plaintiff walked steadily, could do a deep knee bend, and got onto the table without assistance. *Id.* Plaintiff's spinal range of motion was decreased. *Id.* Straight leg testing was negative for back pain. *Id.* Dr. Shultz said that Plaintiff:

> needs a thorough evaluation by a psychiatrist to determine the true extent of disability due to his depression. He does have a very severe problem with mood swings and, therefore, psychiatric evaluation is needed.

R. 168-169. She added: "He takes no medication for his back pain and it is [sic] does not appear that he has a severe disability from this back," but she felt an orthopedic evaluation was warranted. R. 169.

On February 17, 2005, a new patient intake form was filled out for health care treatment at Health Point Medical Group. R. 205. Plaintiff sought treatment for back pain. *Id.* He had filed for disability benefits at this point. *Id.* He said he was under treatment for depression. *Id.* Plaintiff complained of unusual fatigue, frequent headaches, nose bleeds, neck pain or stiffness, frequent diarrhea, joint stiffness and swelling, back pain, difficulty walking, rashes, change in skin color, frequent recurring headaches, dizziness, head injury, memory loss, depression, excessive thirst, and

slowness to heal after cuts or wounds. R. 207-208. Plaintiff's medications were Skelaxin,[8] Tramadol,[9] and Zoloft.[10] R. 203.

On February 18, 2005, Plaintiff had an x-ray of his spine. R. 214. No acute bony abnormality was identified in Plaintiff's thoracic, lumbar, and cervical spine, and the impression was that this was an "unremarkable study." *Id.*

On March 1, 2005, Plaintiff returned to Health Point Medical Group for a followup of his back pain. R. 201. The findings, if any, are illegible.

Plaintiff was involved in a motor vehicle accident on June 16, 2005. R. 243. Another MRI imaging study was conducted on July 26, 2005. R. 213. Disc degeneration was noted at C3-C4 and C4-C5, and disc herniation was found at C5-C6. *Id.* An MRI of Plaintiff's right shoulder was conducted on July 28, 2005, and a labrum[11] tear was noted. R. 211.

On August 19, 2005, Plaintiff went to Brandon Clinic and was seen by Todd Green, D.O., Board Certified in Internal Medicine. R. 246-248. Plaintiff's chief complaint was headaches radiating up from the neck. R. 246. This was "much improved" after neck manipulation, said Dr. Green. *Id.* Dr. Green said that Plaintiff's

_____

[8] Skelaxin is prescribed "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions." PHYSICIANS' DESK REFERENCE (2004), p. 2181.

[9] Tramadol hydrocholoride is marketed as Ultram, a centrally acting synthetic opioid analgesic. PHYSICIANS' DESK REFERENCE (2005).

[10] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[11] A labrum is a fibrous ring of cartilage attached to the rim of a joint. MEDLINE PLUS (MERRIAM-WEBSTER)

cervical spine was "still much worse than prior baseline" and Plaintiff's right shoulder had not improved.  *Id.*  Dr. Green thought that Plaintiff's thoracic spine was somewhat worse, but Plaintiff's lumbar spine had "actually improved quite a bit."  *Id.*  On examination, Dr. Green found mild tenderness in the cervical spine, and mild restriction with rightward rotation and leftward side bending and extension.  *Id.*  Motion testing of the thoracic spine was normal.  *Id.*  Plaintiff had mild restrictions in his lumbar spine with flexion.  *Id.*  On examination, Dr. Green said that cervical compression did not produce any radicular signs.  R. 247.  In the neurological portion of the examination, Dr. Green said that Plaintiff was alert, cooperative, had clear and fluent speech, had good attention span, and his coordination was grossly intact.  *Id.*  The straight leg raising test for spinal pain was negative.  *Id.*  He found that Plaintiff's "power" was intact (5/5+).  *Id.* Dr. Green's diagnoses were status post motor vehicle accident on June 14, 2005, post traumatic cervical sprain exacerbating pre-existing chronic neck pain, exacerbation of right shoulder pain that had worsened, dysesthesia[12] in the proximal *left* upper extremity, improved cervicogenic headaches, improved thoracic and lumbar pain, and disc protrusion at C5-C6 as revealed by the MRI.  *Id.*  Plaintiff had an orthopedic appointment for his right shoulder and a neurosurgical appointment for the cervical disc protrusion.  *Id.*  Plaintiff wanted to continue therapy on an as needed basis.  *Id.*  A followup with Dr. Green was scheduled for four weeks.  R. 248.

Plaintiff was seen by Chet J. Janecki, M.D., on August 23, 2005, for a surgical evaluation of his right shoulder problems.  R. 243.  He complained of right arm and right

---

[12] Dysesthesia is an impairment of sensitivity especially to touch.  MEDLINE PLUS (MERRIAM-WEBSTER).

shoulder pain, neck pain, and low back pain. *Id.* Plaintiff said that he had weakness in his right shoulder, with radiating pain, and had difficulty lifting and moving this arm. *Id.* Plaintiff told Dr. Janecki that the pain in his right shoulder began the month before the accident, in May, 2005. *Id.* Dr. Janecki said that it was unclear from Plaintiff and from Dr. Green's notes "whether or not this was actually the shoulder or secondary to his neck." R. 244. On testing, Dr. Janecki said that axial compression of the cervical spine was "markedly positive" for pain. *Id.* Tenderness along the trapezius and paravertebral muscles was noted, but Plaintiff's strength was intact. *Id.* Movement tests of the right shoulder caused pain. R. 244-245. Dr. Janecki reviewed the shoulder MRI, noting the tear of the superior and inferior posterior labrum. R. 245. His diagnostic impression was post traumatic subacromial bursitis and tendinitis of the right shoulder, rule out partial rotator cuff, and probably labral tears of the right shoulder. *Id.* He said that the symptoms and diagnoses appeared to be the result of the June, 2005, motor vehicle accident. *Id.* He suggested that Plaintiff have an injection to his shoulder, but Plaintiff declined. *Id.* Dr. Janecki did not mention surgery as a remedy. *Id.*

On August 31, 2005, Plaintiff was seen by Lance S. Cassell, M.D., Board Certified in Physical Medicine & Rehabilitation and Pain Medicine. R. 240. Plaintiff said that he had declined the injection offered by Dr. Janecki and had declined surgery.[13] *Id.* Plaintiff reported that he had seen a Dr. Sonstein for a neurosurgical consultation for his cervical spine, and he said that Dr. Sonstein told him there was nothing he could do for

---

[13] The notes inconsistently state that Plaintiff said that Dr. Janecki recommended an injection "and the injection didn't work , and he may be a candidate for surgery." R. 240. It is concluded from Dr. Janecki's notes that Plaintiff did not have an injection and thus it is unknown whether it would have "worked."

Plaintiff. *Id.* Plaintiff said he had attended "conservative physical therapeutics sessions from 06/21/2005 till 08/12/2005," and this had helped, but he still had neck and right shoulder pain, with some low back pain. *Id.* Dr. Cassell said that Plaintiff told him that he had been in a motor vehicle accident in 1992, but the back injury he suffered then had resolved. *Id.* He said that Flexeril helped "reduce his symptomatology." *Id.* On examination, Plaintiff had a positive Hawkins sign[14] in the right shoulder, with decreased range of motion of the shoulder, and pain. R. 241. Dr. Cassell found that range of motion tests in the cervical spine created pain on extension and right rotation, but without tenderness upon palpation. *Id.* Spurling's sign[15] was negative for radiculopathy of the neck, but did produce local pain. *Id.* Thoracolumbar range of motion produced no pain, there was no tenderness upon palpation, and straight leg raising was negative for radiculopathy. *Id.* Plaintiff had full strength in both upper and lower extremities. *Id.* Dr. Cassell noted the MRI of the right shoulder dated July 26, 2005, and the MRI of the cervical spine of the same date showing "diffuse intervertebral disc degeneration with a C5-C6 intervertebral disc herniation." *Id.* Dr. Cassell's diagnosis included post-traumatic aggravation of prior low back pain with occasional symptoms, post-traumatic cervicalgia with aggravation of cervical degenerative disc disease and C5-C6

---

[14] Hawkins sign in fractures of the talar neck, a radiolucent zone beneath the subchondral plate of the head of the talus, indicative of disuse osteoporosis; its absence reflects increased risk of talar avascular necrosis. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[15] Spurling's sign is a test is used for evaluation of cervical spine radiculopathy. The patient laterally bends the neck to each side while maintaining a posture of cervical extension. Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy. Pain with contralateral bending suggests musculo-ligamentous origin. UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at: http://www.med.ufl.edu/rheum/rheumTests.htm

intervertebral disc herniation as shown by the MRI, and post-traumatic right shoulder pain with labral tear, glenohumeral joint effusion, and infraspinatus tendinosis as shown by the MRI. R. 241-242. Dr. Cassell suggested a cervical epidural steroid injection, but Plaintiff declined. R. 242. Plaintiff also declined further physical therapy. *Id.* Dr. Cassell concluded, therefore, that Plaintiff had reached maximum medical improvement and had suffered permanent injuries to his spine from his motor vehicle accident. *Id.* Dr. Cassell assigned an 8% permanent impairment. *Id.*

On October 27, 2005, Plaintiff returned to Health Point Medical Group complaining of back pain. R. 199. He brought in the MRI reports. *Id.* Skelaxin and Tramadol were continued. *Id.*

On February 20, 2006, Plaintiff was seen again by Dr. Green for re-evaluation of his injuries. R. 218. Plaintiff said that he took ibuprofen three or four times a week for pain. *Id.* Plaintiff said that his headaches had improved somewhat. *Id.* Plaintiff's cervical spine pain had improved, though he had fairly constant pain, but pain in his right shoulder had increased. *Id.* His thoracic and lumbar spine was worse than the baseline, said Dr. Green. *Id.* On examination, Dr. Green said that Plaintiff was in no acute distress, was cooperative, and his gait was normal. *Id.* Plaintiff's cervical spine showed considerable tenderness in the high suboccipital area bilaterally, and mild tenderness elsewhere. R. 219. He had mild restriction with rightward motion. *Id.* Plaintiff had some tenderness of the thoracic spine, but only mild restriction with flexion. *Id.* Plaintiff's lumbar spine had tenderness, with mild restriction on flexion. *Id.* Hawkins's sign was positive for pain in the right shoulder radiating down the lateral arm. *Id.* The neurological examination revealed that Plaintiff was alert and cooperative, had

clear speech and good attention, and his coordination was grossly normal. *Id.* Cervical compression did not elicit radicular signs, and straight leg raising was negative. *Id.* Plaintiff's grip strength was symmetrical and intact. *Id.* Dr. Green noted that the January 31, 2006, x-rays of Plaintiff's cervical spine showed "some moderate degenerative change in the mid and lower region," but Plaintiff's thoracic and lumbar regions of the spine were normal on the x-rays. *Id.* An x-ray of Plaintiff's right shoulder and elbow was ordered. R. 220.

On February 28, 2006, Plaintiff was examined by Robin Hughes, M.D., for a consultative disability evaluation. R. 253. Dr. Hughes noted the labrum tear of the right shoulder and herniation at C5-C6. *Id.* Plaintiff reported chronic shoulder pain, and chronic neck and back pain associated with his motor vehicle accidents. *Id.* He said he was to have had shoulder surgery but had not been able to have this surgery. *Id.* Plaintiff said that he had difficulty standing, bending, and lifting. *Id.* Plaintiff said he could sit, stand, or walk for only 30 minutes, and could not lift at all on his right side. *Id.* He was then taking Flexeril,[16] Motrin, and Skelaxin. *Id.* On examination, Dr. Hughes found no overt signs of anxiety or depression, and Plaintiff's mood and behavior were pleasant. *Id.* Plaintiff's calculations and short-term memory were good. *Id.* Plaintiff's vision was 20/30 bilaterally without glasses. R. 254. The examination of Plaintiff's spine revealed no scoliosis, but positive tenderness was found along the cervical and lumbar spine. *Id.* Dr. Hughes further found: "Kemp's test for facet irritation is positive

---

[16] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls. Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

without radiculitis for the lumbar spine. Positive cervical compression test bilaterally. Negative Spurling's sign for cervical radiculitis." *Id.* Tenderness without swelling or crepitation was also noted in Plaintiff's right shoulder joint, and Plaintiff was found to have "loss of gross strength of the right hand secondary to right shoulder pain." *Id.* Dr. Hughes said that Plaintiff "is able to [pick up] coins, button shirts and use a pen." *Id.* It was noted that Plaintiff is right handed. *Id.* Plaintiff's grip strength was 30 pounds on the right and 100 pounds on the left. *Id.* The motor examination showed weakness of the right shoulder (3/5) but without muscle atrophy. *Id.* Plaintiff was able to walk on his heels, toes, squat, and do deep knee bending with some difficulty due to back pain. R. 255. Plaintiff could arise from his chair and walk "with some difficulty," and he walked with a slow, wide based tandem gait. *Id.* Dr. Hughes's impression was status post motor vehicle accident three times, cervical herniation at C5 by MRI, labrum tear of the right shoulder needing surgical repair, and a history of depression. *Id.*

On March 2, 2006, Plaintiff was seen by Steven F. Wu, Ph.D., on referral by the Florida Office of Disability Determinations for a clinical interview and a mental status examination. R. 259. Dr. Wu cautioned that the information provided by Plaintiff had not been independently corroborated and should be cautiously considered. *Id.* Dr. Wu noted a prior visited to Dr. Stoll, where Plaintiff reportedly was diagnosed as depressed. *Id.* Plaintiff admitted that he had had anger problems since age 8. *Id.* Plaintiff said he had been depressed for the last 10 years, and constantly depressed for the last four years. R. 260. Plaintiff described mood swings, anergy, apathy, avolition, anhedonia, social withdrawal, insomnia, and loss of appetite. *Id.*

Plaintiff told Dr. Wu that he fell at age 8 from the back of a truck, struck his head, and lost consciousness. R. 260. He also said his head was hit again when a car struck him at age 10. *Id.* Plaintiff said that he had back, neck, and arm pain if he sits more than 20 minutes or stands more than 30 minutes, and he reported fatigue and back pain when he walks more than two blocks. *Id.* Plaintiff said that he had been smoking cigarettes since age 10 and smokes one to one and one-half packs a day. *Id.*

Dr. Wu observed that Plaintiff was arrested on April 30, 2002, for dealing in stolen property. R. 260. Plaintiff reported that he lived with his wife but his wife was talking of leaving him, he had one close friend, and he is a "loner." *Id.* He said he quit 9th grade due to anger. *Id.*

Plaintiff said he had been driving tractor trailers since age 16, but cannot do that any longer due to back pain. R. 261. He reported that he always had anger and argument problems at work with supervisors, co-workers, and customers. *Id.* Plaintiff said that he has trouble sleeping, takes cat naps, but if he can sleep, he sleeps 14 hours a day. *Id.* He said he passes the time lying around and sleeping or going to physical therapy. *Id.* He said he can sweep the floor and take out the garbage, but cannot lift anything heavy. *Id.* He can still drive a motor vehicle. *Id.* He drove himself to the evaluation. *Id.*

On examination, Dr. Wu said that Plaintiff was neatly groomed but was "barely cooperative." R. 261. "He came in with a sullen, hostile, irritable, critical, negativistic, entitled and chip-on-the-shoulder attitude." *Id.* Plaintiff repeatedly shifted and stood up, but his posture and ambulation were unremarkable. *Id.* Dr. Wu found him to be in

"moderate emotional distress and severe physical distress today." *Id.* Dr. Wu said that

rapport was poor, and Plaintiff was "difficult to empathize with." *Id.* Dr. Wu said:

> He clearly has an anger and attitude problem that is part of a personality
> disorder. His recent and remote episodic memory is impaired. He has no
> psychological insight or sophistication and social judgment is impaired.
> His thought process was clear, coherent, organized and goal-directed.
> Thought content was reality-oriented with no suicidal or homicidal ideation.
> Reality testing was intact with no florid or overt delusions, paranoia,
> sensory-perceptual disturbances. Affect was labile, range full, intensity
> excessive. Mood was angry, hostile, bitter and frustrated. Volition was
> low energy and spontaneous. Motivation was low.

R. 261.

Dr. Wu found that Plaintiff was oriented in all spheres, and in two of three

concentration task had no errors. R. 261. Dr. Wu found that Plaintiff made one error on

the serial 3's test, "suggesting impaired sustained concentration." *Id.* Plaintiff got two of

the last four Presidents correct, suggesting below average remote memory. *Id.* He was

able to recall only one of four objects after five minutes, suggesting below average short

term semantic auditory recall. *Id.* On a higher order reasoning test, Plaintiff got only

two out of eight of conceptual similarities, and none out of eight on hypothetical

common-sense dilemmas, suggesting to Dr. Wu that Plaintiff had "extremely poor

abstracting and judgment/common-sense." *Id.* Dr. Wu said that Plaintiff got two out of

four mental calculations, suggesting below average mental calculating. *Id.* Dr. Wu

concluded that "cognitive screening suggests Borderline verbal intelligence." *Id.*

Dr. Wu noted that Plaintiff had been in three motor vehicle accidents, and

thought that he had ruptured and deteriorating discs. R. 261. He said that Plaintiff

probably had had ADHD since early childhood, "and Intermittent Explosive Disorder

which is probably a part of an antisocial personality disorder or organic personality

disorder." *Id.* Dr. Wu thought it possible that Plaintiff had a frontal lobe defect from three childhood concussions since the first concussion was at age 8, when Plaintiff's anger problems began. *Id.*

Dr. Wu's diagnostic impressions were (1) rule out personality disorder due to head trauma (frontal lobe defect), (2) intermittent explosive disorder, (3) attention deficit hyperactivity disorder – combined type, (4) major depression – severe, and (5) nicotine dependence. R. 262. Dr. Wu suspected that Plaintiff had borderline intellectual functioning and wanted to rule out antisocial personality disorder. *Id.* He thought that Plaintiff had deteriorating and herniated discs and myofascial pain syndrome. *Id.* He assigned a GAF score of 40.[17] *Id.* He thought that Plaintiff's prognosis was poor due to psychological maladjustment, spinal problems, and low IQ and achievement. *Id.* He thought Plaintiff to be incompetent to handle his funds because of low cognitive functioning. *Id.*

On March 9, 2006, James Mendelson, Ph.D., a state agency psychologist, conducted a review of the records to determine Plaintiff's mental impairments. R. 263. He did not examine Plaintiff or administer any objective tests. Dr. Mendelson said that Plaintiff had dysthymic disorder.[18] R. 266. He thought that Plaintiff had a personality

---

[17] A GAF score of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[18] Dysthymia (dysthymic disorder), according to the DSM-IV, is a mood disorder characterized by depressed feelings (sad, blue, low), loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed

disorder characterized by inflexible and maladaptive personality traits causing either

significant impairment in social or occupational functioning or subjective distress.  R.

270.  He thought that this was evidenced by pathologically inappropriate suspiciousness

or hostility; persistent disturbances of mood or affect; pathological dependence,

passivity, or aggressiveness; and intense and unstable interpersonal relationships, and

impulsive and damaging behavior.  R. 270.  In the portion reviewing whether Plaintiff

had Listed impairment, Dr. Mendelson thought that Plaintiff was only moderately limited

in maintaining social functioning, concentration, persistence, or pace, and was only

mildly limited in activities of daily living.  R. 273.  Dr. Mendelson also completed a

mental residual functional capacity assessment.  R. 277.  He thought that Plaintiff was

moderately limited in ability to perform activities within a scheduled, to maintain

regularly attendance, and to be punctual.  *Id.*  He thought Plaintiff was moderately

limited in his ability to interact properly with the general public, to accept instructions

and to respond appropriately to criticism from supervisors, and to get along with

coworkers without distracting them or exhibiting behavioral extremes.  R. 278.  Dr.

Mendelson noted that Plaintiff was negative, hostile, critical, and uncooperative.  R. 279.

He noted that Plaintiff was able to work with his mental problems until physical problems

interfered.  *Id.*  Dr. Mendelson said that while Plaintiff had "some features of depression

and clearly [has] a Personality Disorder," other data suggests that he "is quite capable

---

sleep patterns, lack of energy, low self esteem, poor concentration or decision-making
skills, and feelings of hopelessness.  The diagnosis describes symptoms that have
persisted for more than two years but are not severe enough to meet the criteria for
major depressive disorder.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE
CONSUMERS.

of adequately participating in work like activities," though he is best suited for work that does not require social contact and skills. *Id.*

On March 20, 2006, Plaintiff returned to Dr. Green for further treatment for pain. R. 215. Plaintiff reported that his headaches were improving. *Id.* Dr. Green said that although Plaintiff's cervical spine "was improved quite at bit," it had worsened for uncertain reasons and was worse than the prior baseline. *Id.* Plaintiff said he was stiff, sore, and sometimes had pain on most days, and this became worse with activity. *Id.* Plaintiff said that he had "some vague discomfort in the left shoulder," and the right shoulder pain was "much worse." *Id.* Dr. Green did not think the left shoulder was related to the motor vehicle accident in June, 2005. *Id.* Plaintiff's right upper extremity and hand pain radiation had resolved. *Id.* Dr. Green said that Plaintiff had pain that was worse in his thoracic spine, and the pain could radiate into his neck. *Id.* Plaintiff's lumbar spine had improved quite a bit. *Id.* On examination, Dr. Green found that Plaintiff's cervical spine showed mild to moderate tenderness, with mild restriction of rightward rotation and extension. *Id.* Motion testing of the thoracic spine was full and normal, with "mild subjective tenderness" but objectively normal. R. 216. Motion testing of the lumbar spine showed "very mild restriction with extension," and slight tenderness. *Id.* Straight leg raising was negative, and power was intact in all extremities. *Id.* Neurologically speaking, Plaintiff was alert, cooperative, and had clear, fluent speech, with good attention. *Id.* Dr. Green's impression in part was chronic cervical pain, "worsened lately with daily symptoms now and worse than prior baseline," chronic

lumbar pain, worse than the baseline, *right* upper extremity and hand dysesthesia,[19] resolved. *Id.* Dr. Green recommended an MRI of the cervical spine and right shoulder to rule out a new herniated disc or other anatomic change of the cervical spine. *Id.*

On July 26, 2006, Arthur Hamlin, Psy.D., completed a psychiatric review technique form. R. 289. Dr. Hamlin did not examine Plaintiff or perform any objective tests. Dr. Hamlin wanted to rule out personality disorder due to head injury. R. 290. He thought that Plaintiff suffered from MDD (major depressive disorder) and ADHD (attention deficit hyperactive disorder). R. 292, 294. Dr. Hamlin thought that Plaintiff also had intermittent explosive disorder. R. 296. In determining whether Plaintiff's disorders met the criteria "B" of the Listed Impairments, Dr. Hamlin, like Dr. Mendelson, thought that Plaintiff had moderate difficulties in maintaining social functioning. R. 299. Dr. Hamlin prepared a mental residual functional capacity assessment. R. 303. The only significant limitations that he checked were moderate limitations in ability to accept instructions and to respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in a work setting. R. 304. Dr. Hamlin said: "Reduction in social functioning is secondary to mood disorder with anger dyscontrol problems and difficulties managing stress." R. 305. Dr. Hamlin thought that the evidence indicated that Plaintiff could relate appropriately in a structured setting with limited social demands. *Id.* He thought that Plaintiff could recall work-like procedures

---

[19] Earlier, dysesthesia was noted on the left.

and instructions, sustain focus, adjust to a performance-based setting, and meet the mental demands of concentrated task-oriented activities. *Id.*

On March 3, 2008, and on March 10, 2008, Plaintiff underwent a comprehensive vocational evaluation by Holly Robinson, a vocational evaluator at the Center for Independent Living of North Central Florida in Gainesville, Florida. R. 315. The evaluation was a referral from Christianah Falade, a vocational rehabilitation counselor. *Id.* The purpose in part was to determine whether Plaintiff was "ready for immediate job placement." *Id.*

Plaintiff reported that he lived on his mother's property, had reliable transportation, and drove a motor vehicle. R. 315. He said that he earned gas money by doing odd jobs for his family, such has hauling scrap metal. R. 315. Plaintiff said that his typical day is to wake up, take pills, watch television, or get food. *Id.* He said that he becomes sleepy watching television due to boredom. *Id.* Plaintiff said that although he was seeking social security benefits, he would rather work "if he could find something he could do." *Id.* He said he could not continued to drive a truck due the lifting requirements of that job. *Id.* He reported an interest in working as a private investigator. R. 316.

When asked to describe his disability, Plaintiff said that he was unable to work due to problems with his back, neck, and arm. R. 316. Robinson reviewed records from Southeastern Rehabilitation Medicine and found that Plaintiff had been diagnosed with "chronic intractable pain syndrome, degenerative disc disease of the cervical spine with disc herniation at C4-5, and right shoulder labral tear." *Id.* He was prescribed

Ultram[20] and Robaxin,[21] but had not filled the prescription for Robaxin due to lack of money. *Id.*

Plaintiff asserted that he had tendinitis in his dominant right hand, and thought that he had only 30% of the function of that hand. R. 316. He reported that he had headaches about five times a week, and occasionally can "pop" his herniated disc back into place and relieve the headache. *Id.* Plaintiff said he must move around because his tail bone is sensitive to sitting, and that he can walk or stand only for 20 to 30 minutes. *Id.*

Plaintiff said that he left the company for which he drove a truck when the company went out of business in 2004. R. 317. He had not worked since 2005. *Id.* He had also done part-time work in 2003 and 2004 in landscaping and carpentry. *Id.*

Plaintiff admitted that he had twice been arrested for theft. R. 317. He said that the arrest in 1991 ended with two years of probation. *Id.* He said that he was arrested in 2007 for grand theft, but the charge was dismissed. *Id.* He asserted that neither charge was a felony. *Id.*

During the evaluation, Robinson observed that:

[p]ain behaviors were abundant during the initial appointment. Mr. Morris shifted in his seat almost constantly and was observed wincing. He sat for an hour and fifteen minutes without requesting a break; however, twice during that time he asked to switch chairs, stating he needed to find something that was more comfortable due to his sensitive tailbone.

---

[20] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic. PHYSICIANS' DESK REFERENCE (2005).

[21] Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

R. 317. When he took a break, Plaintiff said his back was "killing" him. *Id.* Robinson said that Plaintiff appeared to have significant difficulty with concentration, and that during the second evaluation a week later, his scores increased 20 points "when he seemed to have better control over his pain symptoms." R. 318. Robinson terminated the first evaluation because Plaintiff had just started taking Ultram an hour before the evaluation, it "was obvious he was experiencing significant pain," and he had difficulty with concentration. *Id.*

Robinson said that when Plaintiff returned a week later to continue the evaluation, fewer pain behaviors were observed. R. 318. Plaintiff sat for over an hour with no shifting or complaints. *Id.* Plaintiff said he began to experience pain in his tail bone after 90 minutes, however. *Id.* Plaintiff asked for two 5 to 10 minutes breaks during the two and one-half hours required to complete the evaluation on the second occasion. *Id.* Robinson said that Plaintiff's results on the math test seemed below his abilities as he would not use scratch paper to work out a problem, and his arm was beginning to hurt after writing for a while. *Id.* Robinson conducted a Kaufman Brief Intelligence Test 2, which produced a composite IQ score of 67, and 54 on the non-verbal portion, but she thought that the scores, especially on the non-verbal portion, were not reliable due to "apparent pain" that affected Plaintiff's concentration. R. 319. She then administered a less time-consuming Beta III intelligence test. *Id.* Plaintiff's Beta IQ was 74, in the below average range. *Id.*

Plaintiff was tested for form perception, finger dexterity, motor coordination, manual dexterity, and color discrimination. R. 322. His scores were in the lowest one

third to the lowest 10%.  *Id.*  Robinson said that Plaintiff performed the tests primarily

with his left hand, which is not his dominant hand.  *Id.*

Plaintiff's arithmetic and reading scores were 81 and 91, respectively.  R. 323.

The arithmetic score was higher than only 10% of the population, and the reading score

was average.  *Id.*

In the assessment of transferable skills, Robinson said that Plaintiff's inability to

sit for extended periods of time, and his back and shoulder injuries, would limit his ability

to load a truck or to drive it, or to perform construction work.  R. 323.  She did not think

he could return to these jobs.  *Id.*  Robinson said that due to Plaintiff's physical

limitations, "no feasible vocational goals" existed at that time for Plaintiff.  *Id.*  She

reasoned:

> Because the unstable nature of his experience with intractable pain
> syndrome, Mr. Morris would not be able to commit to an employer any
> specific hours of availability.  Although he might be able to obtain
> employment, it does not seem likely, based on the observations
> throughout the evaluation, that Mr. Morris would be able to maintain long-
> term employment.  Until he is able to gain some control over his condition,
> Mr. Morris is encourage to pursue social security benefits to assist him
> with living expenses.

R. 323-324.

Robinson then summarized her findings.  She found that Plaintiff's academic and

intelligence skills are below the average range.  R. 324.  She said that Plaintiff cannot

return to the physically demanding jobs he used to do, and his skills, limited to those

occupations, do not easily transfer to other jobs.  *Id.*  She found that Plaintiff's pain is

unstable and this limited his work prospects because he is not reliably available for

work.  *Id.*  She concluded: "It is clear from the pain behaviors observed and overall

inability to concentrate and stay on task that Mr. Morris would not be able to endure a full day of work, and would have difficulty committing even to a part-time job." *Id*.

**Legal analysis**

### Whether the Administrative Law Judge erred in giving no weight to the opinion of Dr. Wu, the consultative examining psychologist, and by not explaining the decision

Plaintiff contends that it was error to give "great weight" to the mental residual functional capacity opinions of Drs. Mendelson and Hamlin, who did not examine or interview Plaintiff, and by failing to give substantial weight to the opinion of Dr. Wu or to explain why Dr. Wu's opinion was not given any weight. Doc. 13, p. 12. This argument is directed to the ALJ's mental residual functional capacity assessment.

A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given special deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight"). The opinion of a consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence. If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great weight. Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 01, 2008) (not selected for publication in the Federal Reporter, No. 08-12853) (citing 20 C.F.R. § 404.1527(f)(2)(i)). To like effect is Giddings v. Astrue, 2009 WL 1813741 (2nd Cir. Jun 26, 2009) (not selected for publication in the Federal Reporter, No. 08-1108-CV):

> We recognize, of course, that Dr. Hargraves only examined Giddings
> once, and is not entitled to the deference of a treating physician. *See
> Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("With respect to 'the

nature and severity of [a claimant's] impairment(s),' 20 C.F.R. §
404.1527(d)(2), the SSA recognizes a 'treating physician' rule of
deference to the views of the physician who has engaged in the primary
treatment of the claimant." (internal quotation marks omitted)).  We also
acknowledge that generally, "in evaluating a claimant's disability, a
consulting physician's opinions or report should be given little weight."
*Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).  At the same time, ALJ
Zolezzi did not refer to any medical opinion that contradicted the medical
opinion of Dr. Hargraves as to Giddings's ability to sit, stand, or walk
during the work day.  *And we have indicated that, when a medical opinion
stands uncontradicted, "[a] circumstantial critique by non-physicians,
however thorough or responsible, must be overwhelmingly compelling in
order to overcome" it.  Burgess*, 537 F.3d at 129 (internal quotation marks
omitted); *see McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d
795, 799 (2d Cir. 1983) (stating that "t*he ALJ cannot arbitrarily substitute
his own judgment for competent medical opinion*" and that "[w]hile an
administrative law judge is free to resolve issues of credibility as to lay
testimony or to choose between properly submitted medical opinions, he
is not free to set his own expertise against that of a physician who testified
before him" (citation and internal quotation marks omitted)); *see also
Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (*per curiam*)
("Even if a treating physician's opinion is not entitled to controlling weight,
[t]reating source medical opinions are still entitled to deference and must
be weighed using all of the factors provided" in the Commissioner's
regulations.) (internal quotation marks omitted); *Lester v. Chater*, 81 F.3d
821, 830 (9th Cir. 1995) ("As is the case with the opinion of a treating
physician, the Commissioner must provide '*clear and convincing' reasons*
for rejecting the *uncontradicted* opinion of an examining physician.").

2009 WL 1813741, *2 (emphasis added).  Thus, where a consultative medical opinion is

the *only* medical relevant medical opinion, the ALJ must provide a "compelling critique

to overcome the uncontradicted medical opinion" of the consulting physician.  *Id.*

"The opinions of nonexamining, reviewing physicians . . ., when contrary to those

of the examining physicians, are entitled to little weight, and standing alone do not

constitute substantial evidence."  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir.

1987).  *See also*, Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990) (the opinion

of a non-examining physician is "entitled to little weight and taken alone does not

constitute substantial evidence to support an administrative decision." ), *citing*, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985).  Nonetheless, although the ALJ is not bound by nonexamining state agency sources, assessments by non-examining physicians may be considered by the ALJ as expert opinions.  20 C.F.R. § 416.927(f)(2)(i).

The Administrative Law Judge in this case did not explicitly explain why he disregarded Dr. Wu's mental impairment opinions in favor of the two nonexamining state agency psychologists, Dr. Mendelson and Dr. Hamlin.  Defendant's argument, that the ALJ "accorded significant weight to Dr. Wu's assessment" by determining at step two that Plaintiff has the "severe" impairments of intermittent explosive disorder, attention deficit hyperactivity disorder, and major depression, Doc. 20, p. 5, citing R. 15, is not persuasive.  A "severe" impairment at step two is a very slight impairment.[22]  It was not necessary to give significant weight to Dr. Wu's opinion to reach that conclusion.  Had the ALJ accorded *significant* weight to Dr. Wu's evaluation, the conclusions at steps three, four, and five would have been quite different.  The court, therefore, must review the ALJ's decision to see if the ALJ discussed evidence that implicitly explained why he gave Dr. Wu's opinion no weight at all.

---

[22] At step two, a "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working."  Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so *slight* that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration."  Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

At step three, the ALJ considered whether Plaintiff's mental problems met or equaled a Listed impairment. The ALJ acknowledged that Dr. Wu thought that Plaintiff had very significant impairments in his social interactions, finding that Plaintiff was barely cooperative, in moderate emotional distress, had poor rapport and avoided eye contact. R. 16. Drs. Mendelson and Hamlin, however, decided that Plaintiff's social impairment is only moderate. Dr. Wu's opinion indicates something more than moderate impairment of social functioning. In this portion of the opinion, the ALJ observed that in August, 2004, Dr. Stoll, a psychiatrist, had found Plaintiff to be cooperative, with good eye contact, with normal and coherent speech, but with a "quite irritable" mood. *Id.* He noted that in December, 2004, Dr. Shultz found Plaintiff to be agitated at times. *Id.* He noted that also in December, 2004, Mrs. Morris said that Plaintiff "could briefly talk with one friend once a week." *Id.* He noted that in August, 2005, and March, 2006, Dr. Green found Plaintiff to be cooperative, with clear and fluent speech. *Id.* The paragraph concludes with the observation that Plaintiff testified that he could visit with his brother, and the record contained no evidence of "frequent domestic, neighborhood or workplace disputes, charges for assault or disorderly conduct, evictions, lawsuits, or other indicia of maladaptive social behaviors." *Id.* He concluded from all of this that Plaintiff has no more than moderate difficulties in social functioning. *Id.*

These findings by Drs. Stoll, Shultz, and Green, and Mrs. Morris are supported by substantial evidence in the record, but the conclusion drawn from them, that Plaintiff has only moderate difficulties in social functioning, is not supported by substantial evidence in the record. Dr. Stoll's statement that Plaintiff was cooperative and had good

eye contact is eroded by her finding that Plaintiff was "irritable," that he suffered from major depression, and her finding that Plaintiff's GAF score was 48. R. 164. Dr. Shultz's finding that Plaintiff was agitated at times is consistent with Dr. Wu's findings. Indeed, Dr. Shultz said that Plaintiff:

> needs a thorough evaluation by a psychiatrist to determine the true extent of disability due to his depression. He does have a very severe problem with mood swings and, therefore, psychiatric evaluation is needed.

R. 168-169. Dr. Green did find Plaintiff to be cooperative, with clear and fluent speech, but Dr. Green was examining Plaintiff for physical impairment, and these comments occurred in the course of his neurological assessment, not a psychological assessment. R. 247. In summary, if this were all, the conclusion of the ALJ to reject Dr. Wu's evaluation would not be supported by substantial evidence in the record.

This is not all, however. At step four, the ALJ determined Plaintiff's mental residual functional capacity. R. 19. This determination included, but was not limited to, Plaintiff's social functioning. Later in the opinion, the ALJ decided to give substantial weight to the opinions of Dr. Mendelson and Dr. Hamlin, the nonexamining state agency psychologist who expressed opinions as to Plaintiff's mental residual functional capacity. R. 22. Dr. Wu is mentioned in this paragraph, but the ALJ did not explain why he did not credit Dr. Wu's opinion. *Id.* Still, he noted some evidence in this paragraph, some of the evidence that he had already discussed on page 19 of the opinion. *Id.*

The ALJ first noted that in August, 2004, Dr. Stoll had found that Plaintiff's GAF score was 48, indicative of severe impairment of social and occupational functioning. *Id.* The ALJ observed that In March, 2006, Dr. Wu assigned a GAF score of 40, indicative of even greater impairment, and thought that Plaintiff had a personality

disorder due to head trauma. *Id*. He also noted that Dr. Wu found that Plaintiff suffered from intermittent explosive disorder, ADHD, and severe depression. *Id*. The ALJ also again observed that Dr. Wu found Plaintiff to be barely cooperative, in moderate emotional distress, with poor rapport and avoidance of eye contact. *Id*. He also noted that Dr. Wu thought that Plaintiff was not capable of handling money due to his low cognitive functioning. *Id*. The ALJ did not discuss these findings any further, and did not explain why he did not give them any weight. This evidence, standing alone, was substantial evidence that would have compelled a finding that Plaintiff's social impairment is severe, not merely moderate.

The ALJ then described more positive evidence in the record, and it is this evidence that Defendant now argues is sufficient to reject the opinion of Dr. Wu. First, the ALJ mentioned that Dr. Stoll, in August, 2004, found that Plaintiff's memory was grossly intact. R. 19. Further along in the decision, he returned to the August, 2004, findings by Dr. Stoll, that while Plaintiff was in a "quite irritable" mood, he was cooperative, had good eye contact, normal and coherent speech, had grossly intact memory, and had fair insight and judgment. R. 22. That Plaintiff was quite irritable erodes the finding by Dr. Stoll that Plaintiff was cooperative. But more to the point, this passage does not account for the fact that Dr. Stoll, a psychologist, assigned a GAF score of 48 to Plaintiff, indicative of severe mental problems that would interfere with his ability to hold a job. Plaintiff may have been cooperative on one level, had good eye contact, had normal speech, and his memory was grossly intact, but he was irritable, he had only fair insight and judgment, and his GAF score was 48. Dr. Stoll's findings are not substantial evidence to reject the opinion of Dr. Wu.

The ALJ next observed that in December, 2004, Dr. Shultz thought that Plaintiff had normal intellectual functioning.  R. 19.  Further along in the decision, the ALJ again mentioned the December, 2004, findings of Dr. Shultz, that while Plaintiff was agitated at times, he "was in an only somewhat somber mood, and had normal speech and intellectual functions."  R. 22.  Like the description of Dr. Stoll's evaluation, this disregards important portions of Dr. Shultz's evaluation.  Dr. Shultz examined Plaintiff primarily for physical impairment.  He did not test Plaintiff for his intellectual skills. Further, Dr. Shultz's observation that Plaintiff had a "somewhat somber mood" and "seemed agitate at times," R. 168, is consistent with the opinion of Dr. Wu.  R. 168.  Dr. Shultz was sufficiently concerned about Plaintiff's mental health that she concluded that Plaintiff:

> needs a thorough evaluation by a psychiatrist to determine the true extent
> of disability due to his depression.  He does have a very severe problem
> with mood swings and, therefore, psychiatric evaluation is needed.

R. 168-169.  That evaluation was performed by Dr. Wu.

The ALJ next said that in August, 2005, and March, 2006, Dr. Green found that Plaintiff was cooperative, had clear, fluent speech, and had good attention span.  R. 19, 22.   These findings by Dr. Green are in the record.  R. 247, 216.  But the findings are not substantial evidence to reject the psychological evaluation by Dr. Wu.  Dr. Green did not treat Plaintiff for depression or personality disorder.  He was not a psychologist. These findings were only part of Dr. Green's neurological examination as he treated Plaintiff for physical impairments, notably cervical spine and shoulder impairments causing pain.

The ALJ also noted that in February, 2006, Dr. Hughes found Plaintiff was cooperative, with pleasant behavior and mood. R. 22. While this also is supported by evidence in the record, R. 253, Dr. Hughes is board certified in occupational medicine and specializes in orthopedic conditions. *Id.* He was not performing a psychological evaluation of depression or social functioning. At most, this is evidence that Plaintiff at times is not angry, irritable, and socially impaired. It is not substantial evidence in the record to give no weight to the evaluation of Dr. Wu.

Finally, the ALJ said that that Plaintiff reported in December, 2004, and September, 2005, that he was able to drive, manage his money, and watch television. R. 19. The ALJ also observed that Plaintiff testified that he was able to drive, shop, manage his money, read, and watch television, was not currently involved in psychiatric treatment or counseling, and had no history of significant mental health treatment. *Id.* Plaintiff's opinion as to his ability to manage his money is contradicted by Dr. Wu's evaluation. That Plaintiff can drive and watch television says nothing about his ability to socially interact with supervisors, co-workers, and the public at work. A lack of mental health treatment might be important evidence to discount Dr. Wu's opinion, but Plaintiff did have mental health treatment in the last six months of 2004. Further, this observation, when considered alone, is not sufficient to disregard Dr. Wu's opinion.

In summary, the evidence cited by the ALJ to reject Dr. Wu's opinion was not particularly inconsistent with Dr. Wu's evaluation. The ALJ should have given greater weight to Dr. Wu's evaluation. Were Dr. Wu a treating medical source, the failure to give sufficient reasons to disregard his opinion would result in a remand with an order to

award benefits.  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986);  Elam v.

Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991).

There is not an equivalent rule for a consultative medical source since there is no

special deference to be given to a consultant.  Consequently, it is recommended that

the case be remanded so that the ALJ may give greater weight to the opinion of Dr. Wu

and then consider Dr. Wu's opinion along with the other evidence.

> **Whether the ALJ erred in failing to give proper weight to the vocational
> rehabilitation evaluation by Holly L. Robinson or to provide adequate
> reasons for not doing so, and whether the ALJ erred by failing to include
> this evidence in a hypothetical to the vocational expert**

Plaintiff argues that the ALJ should have given great weight to the vocational

evaluation by Holly L. Robinson.  Plaintiff argues that the ALJ should have articulated

his reasons for not doing so, and those reasons should have been supported by

substantial evidence.  Plaintiff further argues that the limitations found by Ms. Robinson

should have been assumed in a hypothetical submitted to a vocational expert.  Doc. 13,

pp. 14-18.

Social security regulations distinguish between medical opinion and opinions

from other medical sources.  20 C.F.R. §§ 404.1513(a) and (e)(disability benefits); 20

C.F.R. §§ 416.913(a) and (d) (supplemental security income benefits).  Licensed

physicians and psychologists are deemed "acceptable medical sources" by paragraph

(a)(1) and (2).  Nurse practitioners, physicians' assistants, naturopaths, chiropractors,

audiologists, and therapists are examples of those considered as "other sources" by

paragraph (d)(1), but are not "acceptable medical sources."

Evidence from "other sources" that are medical sources must be duly considered. Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003), citing 20 C.F.R. § 404.1513(d)(1) (nurse practitioner); Williams v. Apfel, 98 F.Supp.2d 625, 631 (E.D. Pa. 2000); McClellan v. Apfel, No. 98-1288-WEB, 2000 WL 433094, at * 8-9 (D. Kan., April 12, 2000) (and cases cited). A vocational expert may not be a "medical" source, but is an "other source" as defined by 20 C.F.R. § 1513(d). Griffis v. Astrue, 619 F.Supp.2d 1215, 1222 (M.D. Fla. 2008).

Social Security Ruling 06-03p clarifies the procedures that should be followed when the record contains evidence from an "other source." The Ruling provides that the same factors guiding the evaluation of an "acceptable medical source" will also govern the evaluation of a medical source that is not an "acceptable medical source" and a "non-medical source." Those factors are:

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

SSR 06-03p. The Ruling provides that:

However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion

of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

\*             \*             \*

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. . . .*

SSR 06-03p (emphasis added).

The Administrative Law Judge discounted Ms. Robinson's evaluation. He

explained:

This opinion is not accorded much weight in that it includes no assessment of claimant's functional capacities; Ms. Robinson is not a physician, and therefore not an "acceptable medical source" as defined in Social Security regulations; and this opinion is inconsistent with the evidence as a whole, as set forth below. Moreover, opinions that the claimant is "disabled" or "unable to work" are reserved to the Commissioner because they are administrative findings that are dispositive of a case . . . .

R. 21.

The first reason given for giving little weight to the opinion of Ms. Robinson, that

she is not a physician, fails to follow SSR 06-03p. That the "other source" is not a

medical doctor is not a sufficient reason, standing alone, to reject the opinion because

SSR directs that opinions of "other sources" may be important evidence. *Cf.*, <u>Turner v. Astrue</u>, 2008 WL 4489933. *14 (S.D. Ala. Sep 30, 2008) (No. 07-00194-CB-B).

The third reason, that Ms. Robinson expressed an opinion that Plaintiff is "unable to work," the ultimate issue reserved to the Commissioner, is unpersuasive. The rules of evidence are quite relaxed in administrative proceedings. Further, even in a jury trial, experts routinely and properly express opinions touching upon ultimate issues. Federal Rule of Evidence 704(a):

> Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

FED. R. EVID. 704(a).[23] Further, Ms. Robinson provided evidence as to Plaintiff's functional limitations, not as to the ultimate issue. She said that Plaintiff's inability to sit for extended periods of time, and his back and shoulder injuries, would limit his ability to load a truck or to drive it, or to perform construction work. R. 323. Robinson said that due to Plaintiff's physical limitations, "no feasible vocational goals" exist for Plaintiff. *Id.* She reasoned that due to "intractable pain," Plaintiff would not be able to "commit to an employer any specific hours of availability." R. 324. She found that Plaintiff's academic and intelligence skills are below the average range and his skills, limited to his work as a truck driver, are not easily transferrable to other jobs. *Id.* She found that Plaintiff's pain is unstable and this limits his work prospects because he is not reliably available for work. *Id.* She concluded: "It is clear from the pain behaviors observed and overall inability to concentrate and stay on task that Mr. Morris would not be able to endure a

---

[23] Subparagraph (b) applies to opinions as to mental state as an element of a crime.

full day of work, and would have difficulty committing even to a part-time job." *Id.*

These are opinions as to Plaintiff's functional limitations as relevant to his vocational

possibilities, opinions well within Ms. Robinson's expertise.

The second reason for giving no weight to Ms. Robinson's evaluation was that it

was "inconsistent with the evidence as a whole, as set forth below." R. 21. The ALJ

then noted that in December, 2004, Dr. Shultz "found the claimant with a steady walk,

and noted that the claimant was able to get on and off an examination table, as well as

get in and out of a chair without assistance . . ." R. 21. He noted that in August, 2005,

Dr. Janecki determined that Plaintiff had pain with motion of his right shoulder, but also

in August, 2005, Dr. Cassell found that despite decreased range of motion and positive

Hawkins's sign in Plaintiff's right shoulder, Plaintiff had "grossly intact sensations and

5/5 motor strength in his extremities. *Id.* The ALJ noted that the x-rays in January,

2006, showed no thoracic or lumbar abnormalities, and only "moderate degenerative

change" of the cervical spine. *Id.* The ALJ next noted: "Moreover, in February 2006,

Dr. Hughes found the claimant with only 3/5 motor strength in his right upper extremity,

but as much as 30-pound right grip strength, 100-pound left grip strength, and normal

manual dexterity." *Id.* He noted that in March, 2006, Dr. Green "found the claimant with

normal gait, 5/5 motor strength, grossly intact coordination, and resolved right upper

extremity and hand dysesthesia . . . ." *Id.* The ALJ wrote that in March, 2006, Dr. Wu

"observed the claimant with unremarkable posture and ambulation . . . ." *Id.* Finally, the

ALJ observed that in June, 2008, "the record at MCHD [Marion County Health

Department] indicated that Plaintiff could not bend at the waist, but by July, 2008,

Plaintiff "no longer had any musculoskeletal functional limitation, despite complaints of pain all over his body."  *Id.*

None of this is inconsistent with Ms. Robinson's evaluation.  The findings of Dr. Schultz, in December, 2004, were before Plaintiff's June, 2005, motor vehicle accident. Further, Dr. Shultz's observations as to Plaintiff's walking and getting on and off the table have little to do with the limitations identified by Ms. Robinson.  She found that Plaintiff has difficulty sitting for a long period of time, especially during the first evaluation, which she terminated due to the pain he was experiencing.  R. 317-318. Even during the second evaluation, Plaintiff needed two short breaks over a two and one-half hour period.  R. 318.  There is a difference between walking a short distance or getting on a table, and the ability to sit for long periods of time.

The findings of Dr. Janecki, that Plaintiff had pain with motion of his right shoulder, and by Dr. Cassell, that Plaintiff had decreased range of motion in his right shoulder and positive Hawkins's sign, R. 21, support the evaluation by Ms. Robinson. Dr. Cassell did find that Plaintiff had grossly intact sensations and 5/5 motor strength in his extremities, but that is not inconsistent with the findings of Ms. Robinson, that Plaintiff had difficulty sitting for long periods of time, and had trouble with right hand and arm dexterity due to impairment of his right shoulder and neck.  R. 317-318, 322.

The ALJ's observation that Dr. Hughes said that Plaintiff had "only 3/5 motor strength in his right upper extremity, but as much as 30-pound right grip strength, 100-pound left grip strength, and normal manual dexterity," R. 21, is likewise not substantial evidence to disregard the findings of Ms. Robinson.  Dr. Hughes found that Plaintiff's strength on the right upper extremity was significantly diminished when compared to his

left upper extremity. This supports the opinion of Ms. Robinson. Further, Dr. Hughes did not find that Plaintiff had "normal manual dexterity." He only observed that Plaintiff "is able to [pick up] coins, button shirts and use a pen." R. 254. It is unclear whether he asked Plaintiff about that, but it seems plain that Dr. Hughes did not administer a formal test of dexterity and manipulation (of the type used by Ms. Robinson, a vocational expert) to determine Plaintiff's ability to perform such skills for an extended period of time.

The ALJ also said that in March, 2006, Dr. Green "found the claimant with normal gait, 5/5 motor strength, grossly intact coordination, and resolved right upper extremity and hand dysesthesia . . . ." R. 21. Findings as to Plaintiff's gait and gross motor strength are not inconsistent with the findings of Ms. Robinson, which relate to Plaintiff's ability to sit for long periods of time and to perform tasks requiring manual dexterity. The finding that Plaintiff's right hand dysesthesia is relevant, though as noted above, the record is equivocal as to whether Plaintiff ever had loss of feeling in his right upper extremity. But Dr. Green also found that Plaintiff's chronic cervical pain "worsened lately with daily symptoms now and worse than prior baseline," his right shoulder pain was much worse, his thoracic pain had become worse, and his chronic lumbar pain was worse. R. 215-216. Dr. Green was sufficiently concerned about Plaintiff's worsening condition that he recommended an MRI of the cervical spine and right shoulder to rule out a new herniated disc or other anatomic change of the cervical spine. R. 216.

Dr. Wu's fleeting observations of Plaintiff's physical status during a psychological evaluation are not inconsistent with the findings of Ms. Robinson. Dr. Wu

did not evaluate Plaintiff's ability to sit for long periods of time without pain and to do work requiring manual dexterity.

Finally, the Marion County Health Department finding does not seem to be supported by the record. On June 5, 2008, it was noted in that medical record that Plaintiff was unable to bend at the waist, and the diagnosis was depression and chronic musculoskeletal pain. R. 328. On June 7, 2008, Plaintiff said that the pain was never constantly gone, and it was noted that he had pain "all over." R. 326. The diagnosis was chronic pain and depression. *Id.* Plaintiff was referred to a pain clinic and Lexapro[24] was prescribed. *Id.* There is no notation on June 7th that Plaintiff's inability to bend at the waist was resolved.

In summary, the evidence of record discussed by the Administrative Law Judge is not inconsistent with the opinion of Ms. Robinson, and the conclusion that it was is not supported by substantial evidence in the record.

The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

---

[24] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

20 C.F.R. §§ 404.1567(b) and 416.967(b).  In other words, to do light work as a truck driver, Plaintiff would have to be able to frequently lift, hold, and carry objects weight up to 10 pounds.  He would have to do a good deal of walking and standing, and when sitting, he would have to have the ability to push and pull with arm and leg controls.  Ms. Robinson said that Plaintiff could not sit and concentrate while taking her tests due to right shoulder and back pain.  She found that Plaintiff's right arm and hand are impaired, and that he significantly lacks dexterity in his right hand and arm.  Finally, she found that Plaintiff scores quite low in intelligence tests, and that he cannot concentrate long enough to take a normal intelligence test.  This is significant evidence to consider when determining whether Plaintiff can do a full day of work, five days a week, as a truck driver.  Since the reasons for failing to give this evidence any weight did not have the support of substantial evidence in the record, a remand is needed to give greater weight to the opinion of Ms. Robinson and then to consider it along with all of the evidence.

**Conclusion**

Dr. Wu found that Plaintiff suffers from significant mental problems that impair his ability to concentrate.  Dr. Wu and Ms. Robinson both agree that Plaintiff's intelligence level is low and he has no transferable skills.  Dr. Wu and others have consistently assigned to Plaintiff very low GAF scores, indicating a significant impairment of functioning.  Ms. Robinson found that Plaintiff's pain level significantly affects his ability to sit and concentrate during testing.  She found that Plaintiff had significant impairment of dexterity in his right hand and shoulder.  All of this evidence should be given significant weight by the Commissioner on remand since the reasons for disregarding

this evidence was not supported by substantial evidence in the record. The evidence of Plaintiff's impairments, of course, must be considered separately and in combination.

Further, the ALJ's finding that Plaintiff will need to frequently stand and stretch while doing a sedentary job seems inconsistent with the finding that Plaintiff can return to his work as a truck driver. Driving a truck may require the ability to do light or medium work, but the job is often sedentary for many hours, especially for a tractor trailer driver. If Plaintiff must frequently stand and stretch doing work from a seated position, there must be a better explanation of how Plaintiff can do work as a truck driver. This probably will require evidence from a vocational expert.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** for reconsideration for the purposes set forth above.

**IN CHAMBERS** at Tallahassee, Florida, on August 31, 2010.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**